JOSEPHINE FLEMING, Respondent, v. WHAT CHEER MINING COMPANY, Appellant.

**Springfield Court of Appeals, June 26, 1916.**

1. **MASTER AND SERVANT: Injuries in Mine: Negligence: Evidence: Jury Question.** Action against mining company for death of plaintiff's husband. The fatal injuries were received while deceased was assisting in taking down a slab from the roof of defendant's mine. The negligence alleged was that defendant did not test said roof. The error complained of was that the trial court erred in submitting the issues to the jury and in refusing to give defendant's requested peremptory instruction. Evidence examined and reviewed and *held* sufficient to justify submitting to the jury the question of the negligence of the roof trimmer in not testing the roof.

2. ————: **Duty of Master to Servant: Assumption of Risk.** It is the duty of the master to use ordinary care in discovering the extent of the dangers of the place into which he sends his servant to make safe. The servant has a right to rely on this being performed by his master and he assumes only such risks as are usual and incident to the service after such care has been exercised.

3. ————: ————: **Injuries: Right of Recovery: When.** Where the servant is engaged in making for the master an unsafe place a safe one, he may recover for injuries sustained while doing the work, absent contributory negligence, where the master has failed in his duty to the servant to use ordinary care to discover the extent of the dangers of the place and the servant's injury is the direct and proximate result of such failure.

Appeal from Jasper County Circuit Court. Division Number One.—*Hon. J. D. Perkins*, Judge.

AFFIRMED.

*J. P. McCammon* and *R. M. Sheppard* for appellant.

*Hugh Dabbs* and *Walden & Andrews* for respondent.

FARRINGTON, J.—This is an action by the widow of Daniel Fleming for ten thousand dollars damages by reason of his death alleged to have been caused by the negligence of the defendant mining company while in its employ. His fatal injuries were received while assisting in taking down a slab from the roof in defendant's mine. Defendant appeals from a verdict and judgment for five thousand dollars in plaintiff's favor.

At the conclusion of plaintiff's evidence the defendant requested and the court refused to give a peremptory instruction. Defendant did not introduce any evidence, and contends that the trial court erred in submitting the issues to the jury. This necessitates a review of the evidence favorable to the plaintiff and of that from which favorable inferences might reasonably be drawn by a jury.

Fleming worked in the underground drifts in defendant's mine in the capacity of helper to a machine man named Devine, it being his duty to assist Devine in drilling holes with a drilling machine in the face and stope of the mine, which holes were later charged with dynamite and exploded for the purpose of breaking the ore-bearing rock. Fleming had worked underground in mines for a least fourteen months before his injuries. In addition to his duty to help the machine man, it was his duty, when requested by the roof trimmer, to assist in taking down slabs which the roof trimmer was unable to take down alone, and when the roof trimer did call for assistance, he (the roof trimmer) took charge of the manner and way of taking down. Defendant employed a regular roof trimmer in this mine whose duty it was to inspect the roof and to take down all loose slabs and rocks which could be pried down. Witness Barker testified: "Q. Now what is the duty of those roof trimmers with respect to a roof after there has been shooting done about it? A. Well, he generally goes around over the drift and trims down any and all loose stuff, boulders, slabs, whatever will drop." "Q. They asked you about these shots, the three boxes of powder in one hole and the 'splitter' being ordinary charges. From your experience as a

miner, what is the ordinary and proper thing to do with reference to the roof after shots of that kind have been put off? A. They generally trim it down.'' ''You often sound the roof to see whether it is drummy, slabby or whatever it may be. In that way I guess you can determine whether it is slabby or loose, frequently when the eye does not discover it. If a roof is a slabby roof and the earth and rock around the slab and vicinity have been cracked and is loose, or likely to come down, you generally shoot it down. That is done by placing powder in a crevice or crack. When that is done the men get out behind a' pillar somewhere.'' Devine tes-tified: ''Those slabs lay in layers in that mine. Mud seams were between them, seams through them in places. The seams are visible in places through them.'' Barker also testified that Fleming had been working at this mine '' a couple of months probably. They had not been taking down boulders very frequently while he was there. I don't know of anyone he assisted in taking down any boulders prior to this time.''

In the performance of his duties as helper, Flem-ing was under the control and supervision of the ma-chine man Devine who had authority to hire and dis-charge his assistant.

Fleming's injury occurred on Monday morning, August 2, 1915. On the Friday preceding defendant had caused a heavy shot, containing three boxes (150 pounds) of dynamite, to be exploded in the stope, but the shot failed to break the ground, and on Saturday, at quitting time, discharged another shot at about the same place, called a ''splitter,'' a term used to desig-nate a hole which is drilled so as to split the distance at the top and bottom and thus complete. the break where it failed before. It was only about ten or twelve feet from the surface of the stope to the roof at this point. This roof overhead was a soft roof, and the effect of shots like those described was to shake loose whatever may be loosened, and sometimes loosened rocks and slabs in the roof. In this connection witness Barker, another machine man in that mine, testified: ''That is the roof trimmer's job to take care of that

condition; he attends to that. He does that with bars; he has roof bars. When it can't be handled with a bar he generally pops it down. He used something like a half-inch steel bar. They have bars about six feet long, and ten and twelve feet long." Witness Comstock was asked: "Can you tell from observing the roof whether it is loose, or is it necessary to sound it or take some other steps? A Well, they generally sound it"

It is shown that Fleming and Devine went on duty Monday at 7:30 a. m., going into the drift and up the stope to the place where they expected to set up the machine. About twelve or fourteen feet from the face they found a slab which sagged down, leaving a crack between it and the roof. Devine then went down toward the shaft and found the roof trimmer and brought him to where the slab was hanging. Devine told Fleming to get a steel and help pry the slab down, and the three of them went to work at this task, standing about eight feet back from the crevice and on the loose dirt from which they could reach the crevice with their bars. They were trying to make the slab fall out in the drift in front of them and it fell that way. Fleming was working with his back toward the face of the drift. The slab turned out to be very large, and broke back ninety feet one way and one hundred feet the other. The trial judge asked Devine: "Well, could you tell when you were prying on this boulder to get it down, that it would, if you did get it down, fall a hundred feet one way and ninety feet the other?" He answered: "Didn't look that big."

It is undisputed that the slab Fleming was helping pry down did not strike him. Devine testified: "Q. What was it hit him? A. Slab. Q. Where was that slab? A. Behind us. Q. Did the slab he pried down, that fell out from you, strike him or graze him? A. No. Q. This other slab was back between you and the face? A. Back between us and the face." The slab they were prying on, when it fell, caused this other slab four or five feet square to fall from a point over

194 M. A.—14

where they were standing and about eight feet back
of the crevice of the larger slab. This smaller slab
struck and crushed Fleming so that he died the fol-
lowing Thursday. Devine testified: "Where you were
standing prying on this slab, could you observe the
roof that afterwards fell as to whether there was any-
thing to indicate whether it was loose or not back
of you? A. No, it didn't look loose. I noticed. - Q.
What is the usual and ordinary way of determining
whether it is loose or not? A. Sounding. Q. Does it
have a peculiar sound when it is loose, a drummy
sound? A. It has a drummy sound." Devine also
testified: "No one had come up there that morning
and sounded or tapped that roof where we were stand-
ing. I found the roof trimmer down at the head of the
runway when I went to him. The first work he did
and I did was to start taking down the slab. . . .
.Mr. Fleming and I were the first men into this drift
that morning. . . . Q. Now had there been any in-
spection; had anyone come up there and sounded or
tapped that roof where you were standing? A. Not that
morning."

Kirkendall, a shoveler in the mine, was preparing
to work in this drift and had noticed the cracked con-
dition of the roof. He said he saw the ground boss
and told him it ought to be trimmed and that the
ground boss replied "All right." This was not over
five minutes before the slab fell on Fleming, at which
time the witness was behind a pillar. He couldn't
say whether the ground boss "went up where the slab
was with the other men, or whether it was simply the
roof trimmer and the two men up there. He came
back past me. I don't mean to say I saw the ground
boss go up there. I don't know where he went. I do
not know of my own knowledge whether he commu-
nicated or had any conversation with those other men
about the roof."

It may be remarked that the defense was a gen-
eral denial and a plea of assumption of risk, the latter
being to the effect that it was Fleming's duty to assist
the roof trimmer in removing slabs from the roof

when called upon to do so; that on this occasion he was assisting the roof trimmer pry down a large boulder from the roof of one of the drifts which wa' known to the roof trimmer and Fleming to be loose and in such condition that the same should be taken down in order to render said place a reasonably safe place in which to work; and that while they were engaged in taking said boulder from the roof a part of said boulder and rock and boulders adjacent thereto fell upon the said Fleming, causing the injuries, etc.

Defendant on appeal contends that the evidence shows beyond question that Fleming was engaged in performing services the object and purpose of which was to make a place safe which was dangerous and unsafe, and that when the work in hand is dangerous for the reason that it is to secure and make safe an unsafe place, the rule, as generally applied, that the master must furnish his servant a safe place in which to work can have no application—that to say that a man can have a safe place in which to work when it is unsafe is an absurdity.

From the foregoing testimony it would be reasonable for a jury to draw these conclusions and inferences: That it was not Fleming's duty to inspect the roof; that it was the regular roof trimmer's duty to inspect the roof after shots had been fired such as as had been fired in this drift, and to take down such boulders and slabs as he could either with bars or powder; that he had not discharged his duty in this particular drift because Devine testified that he (Devine) and Fleming were the first men in the drift that morning and that he went for the roof trimmer when he and Fleming saw the roof sagged down and that when the roof trimmer came up there to pry down the slab it was the first work the roof trimmer had done that morning; that the dangerous condition of the roof was apparent by merely looking at it, but that by merely looking one could not tell that the slab was so large— in other words that it would break back ninety feet one way and one hundred feet another way, although this condition could have been discovered by the ordi-

nary method of inspecting, tapping with a hammer; that the roof of this drift was soft and the effect of shots such as had been fired was to shake loose whatever may be loosened; that the slab the men were prying on did not strike the deceased, it merely causing the smaller slab to fall on Fleming and that there was nothing to indicate that this smaller slab would fall by merely observing it, and that the usual way of determining whether a slab is loose or not is by sounding, looseness being thus indicated by a drummy sound; and that the inspector wholly failed to ascertain by any kind of inspection the extent of the loose condition of the roof in this drift.

Counsel for respondent make sufficient answer to appellant's argument hereinbefore referred to. They contend that in making an unsafe place safe the master must not enhance the natural dangers of the work by his own negligence—"He still owes his servants the fundamental duty of exercising reasonable care for their safety. The fact that the work is inherently more dangerous than other work does not relieve the master of such duty but calls for the adoption of a method suitable to the natural dangers and risks thereof. It would be monstrous to say that a master, with impunity, may subject his servant to danger of death or serious injury where such danger may be obviated by the exercise of ordinary care and common humanity." Fleming was only charged with knowledge of that which he could see and the defendant failed to warn him of the particular danger in the roof immediately above him and where he was standing in assisting to remove the sagging slab. Fleming was under no duty to inspect; it was only his duty to assist the roof trimmer, and the roof trimmer was in charge of that work; he had a right to assume that the roof under which he was working at this task was in a reasonably safe condition. In Jarrell v. Blackbird Block Coal Co., 154 Mo. App. 1. c. 560, 136 S. W. 754, the court used this language: "The rule now may be considered as firmly established that risks which do not belong to the employment when conducted by the master with reason-

able care, are not natural risks of such employment and where caused by the negligence of the master, they are not assumed by the servant for the simple reason that the servant could not, if he would, give the master a right to be negligent and the law will not imply a contract the parties could not establish by express agreement." As stated in respondent's brief, that case answers every argument of the appellant.

We think the plaintiff made a prima facie case of negligence on the part of the defendant in not taking the ordinary method of determining whether the roof was drummy and likely to fall if prying was done on the hanging slab, and that Fleming did not, as a matter of law, assume the risk of this slab over him and which he was not prying on falling upon him as one of the natural hazards of the work. The jury was entitled to believe that the falling of this smaller slab, eight feet back of the crevice at which these men were prying, was not one of the natural risks inherent in the work, and that it was negligence for the roof trimmer to fail to inspect the roof under which Fleming was to work, the condition of which was not disclosed by observation, and warn the deceased. It is a reasonable inference from the evidence that the roof trimmer by sounding could have ascertained the condition of the roof under which Fleming was to work, and there is no pretense that he did so; at any rate, whether the condition was such as could have been ascertained by reasonable inspection on the part of the roof trimmer was a question for the jury to decide.

The rule in this character of cases may be stated as follows: It is the duty of the master to use ordinary care in discovering the extent of the dangers of the place into which he is sending his servant to make safe, the servant has a right to rely on this duty being performed by his master and in his employment as aforesaid he assumes only such risks as are usual and incident to the service after such care has been exercised, and, although he is engaged in making the unsafe place safe, he may recover for injuries sustained while doing that work. absent contributory negligence, where the

master has failed in such duty and the servant's injury is the direct and proximate result of such faliure. [3 Labatt's Master & Servant (2 Ed.), pp. 2475, 2476; Clark v. Johnson County Tel. Co., 146 Iowa, 428, 123 N. W. 327; Reed v. Railroad, 94 Mo. App. 371, 68 S. W. 364.]

Finding no error, the judgment is affirmed. *Robertson, P. J.,* and *Sturgis, J.,* concur.